UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RONALD G. FARBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:13-CV-1266-JAR |
| | ) |
| AMERICAN FAMILY MUTUAL | ) |
| INSURANCE COMPANY, | ) |
| a Wisconsin corporation, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant American Family Mutual Insurance Company's Motion for Summary Judgment. (Doc. No. 21) The motion is fully briefed and ready for disposition.[1] For the following reasons, the motion will be granted.

**Factual background[2]**

In 2011, American Family employed Plaintiff Ronald G. Farber (Farber) as a Commercial Farm/Ranch Field Claim Manager with responsibility over nine to ten claims adjustors, one of whom was Ron Smith. (Defendant's Statement of Uncontroverted Material Facts (SOF), Doc. No. 26, ¶¶ 1-4) In September 2011, American Family received an anonymous

---

[1] On August 20, 2014, Defendant filed a memorandum to the court regarding a recent case, Murrell v. Allstate Insurance Co., No. 4:12-cv-1707JAR, 2014 WL 3859204 (E.D.Mo. Aug. 6, 2014), in support of its motion for summary judgment. (Doc. No. 32)

[2] The facts are taken from Defendant's Statement of Uncontroverted Material Facts (Doc. No. 23) and Plaintiff's Additional Statement of Uncontroverted Material Facts. (Doc. No. 26) The facts are largely undisputed. American Family notes that Farber admitted 127 of its 162 material facts. Of the remaining 35 factual statements Farber purportedly denied, 34 of his denials are not properly supported as required by Fed.R.Civ.P. 56(c) and must be deemed admitted. (Doc. No. 30, pp. 12) Even assuming, for purposes of this discussion, that Farber's denials sufficiently reference supporting record evidence, the Court finds he has failed to show there is a genuine issue for trial.

tip that Smith was involved in an embezzlement scheme with Protech, an outside vendor owned by Chad Bowen, and CRB Enterprises, another company associated with Protech that received fraudulent payments from American Family. (SOF, ¶¶ 5-6; PSOF, ¶ 14) Calvin Cole, Farber's supervisor, notified Farber of the issue, and the two of them analyzed an initial run of American Family's files listing Protech as the payee. (SOF, ¶ 7) American Family began an internal investigation and hired an outside firm, Farmington Risk Management to determine the extent of the embezzlement, identify those involved, document American Family's loss, and determine if the facts met guidelines for criminal indictments of those involved. (SOF, ¶¶ 51-52, 55)

Farber claims that prior to the anonymous tip, he had no knowledge of any issues with Protech. (Plaintiff's Additional Statement of Uncontroverted Material Facts ("PSOF"), Doc. No. 26, ¶ 17) However, it is undisputed that on August 17, 2009, Farber made a note in Smith's Performance Management Administration notebook[3] reflecting an email he sent Smith stating:

> Ron,
> Insured called on this claim and the draft went to the old address.
> I reissued and sent her a copy of your estimate. She doesn't know about the payment including Protech. Says they didn't do any work. This draft has been reconciled. Please follow up on this ASAP!

(SOF, ¶ 9) The next day, August 18, 2009, Farber entered a second note to Smith's Performance Management Administration notebook that shows Farber sent Smith a second email stating:

> First order of business please look into this file. Insured has called twice.
> I have reissued the draft to her. She says you said the amount should be $5,300 area. I sent her a copy of your estimate. Finally, what is the check with Protech. She knows nothing about Protech and said they have not done any work. No estimate or bill from Protech in the file. Get with the insured. If this has been forged we need to do sometime (sic). Was this suppose (sic) to be on another file. If so we need to get the payment off this file.
>
> Call me first thing on this. Took up a lot of time trying to figure this out.

---

[3] Supervisors use the notebook to address issues with employees. (SOF, ¶ 11)

(SOF, ¶ 10) After questioning Smith about Protech in August 2009, Farber never followed up with Smith, and never reported any concerns about the Protech payments to anyone at American Family. (SOF, ¶¶ 12) Farber later explained he had been "working long hours and dealt with a large volume of large payment claims," such that "he must just have missed" the file entries pertaining to Smith and Protech and failed to follow up on those files. (PSOF, ¶ 27, 33)

American Family terminated Smith on October 20, 2011, for his role in the embezzlement scheme,[4] (SOF, ¶¶ 17-18) and, effective November 19, 2011, demoted Farber to the position of Property Claims Desk Senior Adjustor for failing to properly supervise Smith.[5] (SOF, ¶¶ 20-23, 37) Farber appealed his demotion by letter to Joe Guldan, American Family's Human Resources Regional Manager, dated February 29, 2012. (SOF, ¶ 40) In his letter, Farber claims he complained or reported that proper systems were not in place to uncover theft. (PSOF, ¶ 35) American Family disputes Farber's characterization of his letter. In point of fact, Farber's letter states in pertinent part:

> "In my managers notes it states that the reviewing parties found five coaching audits involving the identified companies. I am not sure which reviews these are. <u>I will state that our department was one of the last to utilize the ICS system</u>. This is the system in which claim documentation is stored and which the coaching audit system is located. <u>During the stages of the implementation and use of this process it was noted that there were particular problems with the placement of documents in our ICS. This had been noted during our manager audit in 2009. There was no formal education training in our area on the use of ICS system.</u> A member of our unit participating as a member on team for ICS matters. The member then reported to the unit. <u>We were at this time unsure where documents were being filed by the scanning center. Training was offered in 2011 by Education and Q&A departments in regard to proper placement of documents in ICS folders</u>." (Emphasis added).
> . . .
> "The next note mentions no specific follow up on files noted with deficiencies on PP and

---

[4] Chad Bowen pleaded guilty to one count of mail fraud on December 21, 2012. He was sentenced to 24 months and ordered to pay restitution to American Family in the amount of $905,801.57. (SOF, ¶ 19)

[5] Farber's demotion is not at issue in this lawsuit. (SOF ¶ 23)

> QA audits. <u>Specific follow [sic] on individual files was not instructed to be a practice in our department following our peer to peer or QA audits. We were not instructed to go back into the file with deficiencies and address individual issues on each file</u>. We were to utilize the information to review with our adjusters and to make action plans as needed. See the enclosed note from past manager regarding action plans. <u>In the meeting with our department manager on November 10, 2011, he stated that we now needed to go back into files with noted deficiencies in audits and to correct areas noted in the particular files. This had not been the instructions to the managers in our department previously</u>. I am also enclosing a copy of a memo that was forwarded by our department manager." (Emphasis added).
> . . .
> "<u>It should be noted that the incident in question was not discovered by internal auditing or any department in American Family Claims area</u>. I have reviewed a listing of the claims and payments following notification of the incident. The payments that were issued were made payable to the insured and the contractor. They were addressed to be mailed to the insured. A Tax identification number was listed with the draft entry in our COPS system. The company is also entered in our TIN system. I would assume that the companies would receive 1099 tax form for payments made by American Family. I am enclosing a copy of a draft payment involved. I have erased the insured name and claim number due to file confidentiality. I can supply you a listing of the claims involved in this incident." (Emphasis added).

(PSOF, ¶ 35) American Family responded to Farber's letter on April 5, 2012, notifying him that the decision regarding his demotion would stand. (SOF, ¶ 50)

As part of the investigation into the embezzlement scheme, investigator Harold Copus interviewed Farber on April 20, 2012. (SOF, ¶¶ 60-61, 68, 73) Doug Crandall, American Family's Special Investigations Manager, and Ken Licht, Employee Relations Specialist, attended the interview as observers. (SOF, ¶ 64) Licht took notes of the meeting; Crandall took no notes, but wrote a short summary dated May 24, 2012. (SOF, ¶¶ 65-66) American Family maintains that during the interview, Farber denied any knowledge of Protech prior to the anonymous tip. (SOF, ¶¶ 74-78) Farber vigorously disputes this, stating he did not "pick up" on the Protech issues and "must have missed it." (PSOF, ¶ 49) During the interview, and in response to American Family's question whether he had any ideas about preventing embezzlement in the future, Farber responded that the company needed proper systems in place to detect fraud, and

made the following suggestions: (i) that managers lower their time spans of control; (ii) increase the number of internal audits; (iii) give insureds control over the selection of vendors; and (iv) maintain a centralized list of "bad vendors." (SOF, ¶¶ 82-84, 142; PSOF, ¶¶ 54-57)

In June 2012, Lisa Moran, Associate Vice President of the Central Region, was made aware of the Protech investigation. (SOF, ¶ 119) She reviewed the results of the investigation and determined that Farber's statements that he had not heard of Protech prior to the anonymous tip contradicted the file notes where Farber had questioned Smith specifically about Protech. (SOF, ¶¶ 119-120, 122) On August 15, 2012, American Family terminated Farber for violating its Code of Conduct by misrepresenting his knowledge of Protech during the investigation. (SOF, ¶¶ 124, 133, 135; PSOF, ¶ 59)

On May 16, 2013, Farber filed the instant lawsuit in the Twenty-First Judicial Circuit, St. Louis County, Missouri, alleging that American Family wrongfully terminated him in violation of public policy because he complained about the lack of proper systems in place to detect fraud and made suggestions on how to do so. (Petition, Doc. No. 5) On July 3, 2013, American Family removed the action to this Court. (Doc. No. 1)

**Legal Standard**

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether

summary judgment is appropriate in a particular case, the Court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. Osborn v. E.F. Hutton & Co., Inc., 853 F.2d 616, 619 (8th Cir. 1988). The Eighth Circuit has cautioned that "summary judgment seldom should be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence." Wierman v. Casey's General Stores, 638 F.3d 984, 1002 (8th Cir. 2011).

**Arguments of the parties**

Farber asserts a claim against American Family for wrongful discharge[6] in violation of public policy. He alleges that on April 20, 2012, he complained that "proper systems were not in place to detect and otherwise prevent against stealing" and "made several suggestions about how to detect and to otherwise prevent against stealing." (Petition, Doc. No. 5, ¶¶ 10-11) Farber further alleges that stealing violates a Missouri criminal statute, Mo.Rev.St. § 570.030.1,[7] and that "public policy dictates that the law should encourage the uncovering and prosecution of crimes, and that any policy that discourages citizens from reporting crime or aiding in prosecution would be undesirable and detrimental to society in general," citing Brenneke v. Department of Missouri, Veterans of Foreign Wars of the United States of America, 984 S.W.2d 134, 138-39 (Mo.Ct.App. 1998). (Petition, ¶¶ 15-16)

American Family moves for summary judgment for several reasons. First, Farber was not

---

[6] Plaintiff's petition is styled as one for termination of employment, but the terms "wrongful termination" and "wrongful discharge" are used interchangeably in Missouri case law. Benac v. Eli Lilly and Co., 2013 WL 1914419, *1 n.1 (E.D. Mo. May 8, 2013).

[7] § 530.030.1 provides that "[a] person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion."

a "whistleblower" who reported or exposed any alleged wrongdoing in such a way as to remedy the wrong; he merely responded to American Family's investigation with some suggestions after someone else had "blown the whistle" on unlawful conduct. (Doc. No. 22 at 19) Second, American Family argues there is "no clear mandate of public policy" underlying Farber's claim. Farber relies on a general criminal statute that does not require either the reporting of possible incidents of stealing or implementation of any measures to prevent stealing. (Doc. No. 22 at 20-21) Third, American Family argues there is no evidence of causation linking its decision to terminate Farber with his complaints or suggestions regarding potential changes to company policies or procedures in order to detect or prevent future losses. (Doc. No. 22 at 27) Finally, American Family contends that Farber's claim of discharge in violation of public policy is based on nothing but his own speculation and conjecture. He disagrees with the Company's decision to terminate his employment so he seeks to create some other explanation as a way to contest his discharge. (Doc. No. 22 at 28)

In response, Farber argues there is substantial evidence in the record to support his claim that his reporting to American Family that proper systems were not in place to uncover theft, and acting in a manner that public policy would encourage by suggesting ways to detect theft were contributing factors in the decision to terminate his employment. (Doc. No. 27 at 2-3) He bases his claim on his February 29, 2012 letter appeal of his demotion, his April 20, 2012 meeting with investigator Copus, and his termination on August 15, 2012. Farber asserts it was only after he appealed his demotion and complained about the lack of proper systems in place to uncover theft that American Family conducted further investigation of him regarding the Protech scheme. (Doc. No. 27 at 10-11) Thus, according to Farber, it is reasonable to infer that the interview was conducted in retaliation for his complaints. (Doc. No. 27 at 12) Farber also contends that because

he addressed the appeal of his demotion to John Guldan, who was also present at his termination meeting on August 15, 2012, it can reasonably be inferred that Guldan was either involved in the decision to terminate him or made Lisa Moran aware that Farber had complained or reported that proper systems were not in place to uncover theft. (Doc. No. 27 at 15) Lastly, Farber claims a reasonable inference can be made that American Family was embarrassed that the Protech scheme had not been discovered by Internal Auditing or any other department and "made up lies about his purported aloofness and evasiveness and not being cooperative and forthright" at the April 2012 meeting to justify his wrongful discharge. (Doc. No. 27 at 19-20)

Farber further argues that even if the decision to terminate him was made solely by Lisa Moran, this does not insulate American Family from liability under a "cat's paw theory"[8] of employer liability, relying on Staub v. Proctor Hospital, 131 S.Ct. 1186 (2011). He contends there is ample evidence that Guldan and others acting on behalf of American Family (i) were motivated by unlawful animus towards him; (ii) acted with intent to cause Lisa Moran to terminate his employment; and (iii) proximately caused Moran to terminate him. (Doc. No. 27 at 20-21)

American Family replies that Farber has offered no specific factual support or evidence beyond his own conclusions for his allegations. "Mere allegations not supported with specific

---

[8] The term "cat's paw" derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. Diaz v. Tyson Fresh Meats, Inc., 643 F.3d 1149, 1151-52 (8th Cir. 2011) (citing Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. Staub v. Proctor Hospital, 131 S.Ct. 1186, 1190 n. 1 (2011). The Eighth Circuit has addressed the cat's paw theory a number of times. Qamhiyah v. Iowa State University of Science and Technology, 566 F.3d 733, 742–45 (8th Cir. 2009) (summarizing the cases). It describes "a situation in which a biased subordinate, who lacks decision making power, uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Id. at 742 (quotation and citation omitted).

facts are insufficient to establish the existence of a material issue of fact and will not withstand a summary judgment motion." Depositors Ins. Co. v. Wal-Mart Stores, Inc., 506 F.3d 1092, 1095 n. 3 (8th Cir. 2007). (Doc. No. 30 at 1) American Family asserts that its decision to terminate Farber's employment was a valid business decision. (Doc. No. 30 at 6-8) In further reply, American Family argues Farber's cat's paw argument fails because there is no evidence of discriminatory animus in this case. (Doc. No. 30 at 12-14)

**Discussion**

Generally, under Missouri law, an employer can discharge an at-will employee without cause. Kmak v. Am. Century Companies, Inc., 2014 WL 2524587, at *4 (8th Cir. June 5, 2014) (citing Sivigliano v. Harrrah's N. Kan.City Corp., 188 S.W.3d 46, 48 (Mo.Ct.App. 2006)). However, Missouri recognizes a public policy exception to the at-will employee rule, often called the wrongful discharge doctrine. Fleshner v. Pepose Vision Inst., Inc., 304 S.W.3d 81, 92 (Mo.2010). Specifically, an employee has a cause of action when he or she has been discharged for: (1) refusing to perform an illegal act or an act contrary to a strong mandate of public policy; (2) reporting the employer or fellow employees to superiors or third parties for their violations of law or public policy; (3) acting in a manner public policy would encourage; or (4) filing a claim for workers' compensation. Hedrick v. Jay Wolfe Imports I, LLC, 404 S.W.3d 454, 458 (Mo.Ct.App. 2013) (quoting Delaney v. Signature Health Care Foundation, 376 S.W.3d 55, 57 (Mo.Ct.App. 2012)). The wrongful discharge doctrine is very narrowly drawn; public policy must be reflected by a constitutional provision, statute, regulation promulgated pursuant to statute, or rule created by a governmental body. Hedrick, 404 S.W.3d at 458. Absent a "clear mandate of public policy," a wrongful discharge action fails as a matter of law. Id at 459-60. See also, Margiotta v. Christian Hospital Northeast Northwest, 315 S.W.3d 342, 346 (Mo. 2010) ("A

vague or general statute, regulation, or rule cannot be successfully pled under the at-will wrongful termination theory, because it would force the court to decide on its own what public policy requires.").

Farber maintains he was discharged for acting in a manner public policy would encourage, that is, for making suggestions on ways to better detect or prevent future embezzlement. In an attempt to identify this public policy in a "statute, governmental rule or written policy," he cites Missouri's general criminal statute on stealing, Mo.Rev.St. § 570.030.1. It is well established, however, that a "mere citation" to a statutory provision without a demonstration of how the reported conduct violated it cannot form the basis for a wrongful discharge action. Margiotta, 315 S.W.3d at 347. American Family likens Farber's attempt to create an applicable public policy to the plaintiff in Hedrick v. Jay Wolfe Imports.

In Hedrick, the plaintiff was terminated for purchasing a car from his employer's competitor. He maintained that Missouri has a clear public policy allowing citizens to freely conduct business and that by patronizing his employer's competitor for a better price, he and his live-in girlfriend acted in accordance with that public policy. Plaintiff cited what the court labeled as a "patchwork of various statutes," including the MMPA, which he asserted makes it an "unfair practice to force a buyer into a purchase." He also cited Missouri law on restrictive covenants, claiming the law in this area reflects Missouri's policy to "affirmatively support employees being able to freely conduct their individual business, in all but very few scenarios." Finally, he cited Missouri antitrust law, which makes it unlawful for merchants to conspire to fix a specific price that will be charged for a product. See Hedrick, 404 S.W.3d at 458-59. The court found that none of the statutory authority cited by plaintiff represented "a clear mandate of public policy that clearly encourages the act of buying a vehicle at the best price one could find,

regardless of the consequences that decision brings." Id. at 459. The court went on to state that "we … are prohibited from taking laws out of their statutory context and piecing them together to create a new law or 'a clear mandate of public policy' involving employee/employer relations where one does not clearly exist." Id. at 460.

Similarly, in Margiotta, an image technician brought suit against his former employer, a hospital, alleging he was terminated for reporting violations of federal and state regulations pertaining to patient care at the hospital. 315 S.W.3d at 344. The hospital alleged it terminated the technician for a violent outburst. Id. at 345. In his petition, the technician cited a federal and Missouri regulation that generally discussed providing safe settings for patient care. Id. In affirming summary judgment in the hospital's favor, the court found the statute and regulation cited by the technician were too vague and generalized to support his wrongful discharge action. Id. at 347-48. "No textual part grants protection to employees or requires specific conduct by an employee such as an affirmative duty to report violations." Id. at 348.

Unlike in Hedrick and Margiotta, a clear mandate of public policy was found to support a wrongful discharge claim in Delaney v. Signature Health Care Foundation, 376 S.W.3d 55 (Mo.Ct.App. 2012). There, plaintiff alleged she was discharged because of her decision to become an organ donor, an act that the public policy of Missouri encourages. Id. at 57. As statutory authority for her claim, she cited, *inter alia*, Mo.Rev.St. § 194.302, which establishes an advisory committee to assist in the "development of organ donor awareness programs to educate the general public on the importance of organ donations," § 301.020, which requires the director of revenue to inquire whether applicants for registration of motor vehicles are interested in making a donation to promote an organ donor program, and § 105.266.1(2), which states that any state employee shall be granted a paid leave of thirty days to serve as a human organ donor.

Id. at 57. The court noted other statutory provisions reflecting a clear mandate of public policy encouraging organ donation, including § 143.1016.1, which allows taxpayers to contribute a portion of their tax refund to an organ donor program fund. Id. at n 4. The court found that collectively, these statutes reflect a clear mandate of public policy in Missouri encouraging organ donation such that plaintiff stated a submissible wrongful discharge claim under the third category of the public policy exception to the at-will employment doctrine. See also, Farrow v. Saint Francis Medical Center, 407 S.W.3d 579 (Mo. 2013) (nurse established wrongful discharge claim against hospital by alleging that her refusal to follow the hospital's directive to have non-nurses administer a PICC line was an attempt to comply with the Nursing Practice Act rules regarding specific patient care procedures); Keveney v. Missouri Military Academy, 304 S.W.3d 98 (Mo. 2010) (teacher stated a cause of action for wrongful discharge by alleging he was terminated for insisting that a student's bruises be reported to DFS in accordance with Missouri reporting statutes).

Here, Farber can point to no clear statement of public policy underlying his claim. Unlike the statutes implicated in Delaney, the general criminal statute on stealing does not apply to or specifically protect the conduct at issue. See Margiotta, 315 S.W.3d at 346 ("a general statute … cannot be successfully pled under the at-will wrongful termination theory"). Because the public policy underlying Farber's claim is not reflected in any Missouri statute or based on any clear mandate of public policy, the Court will grant summary judgment in favor of American Family on this basis.

Further, the Court agrees that Farber has not demonstrated a causal connection between his complaints or suggestions regarding potential changes to American Family's policies or procedures to detect or prevent future losses due to embezzlement and his termination. The only

substantiated evidence is that American Family discharged Farber because it found his answers during the investigation regarding his knowledge of Protech inconsistent with his own file notes. (SOF, ¶ 135; PSOF, ¶ 59) Farber asserts there is "substantial evidence in the record" to support his claim that his suggestions to American Family were a contributing factor in his termination. He contends that because the April 20, 2012 interview took place after he sent his February 29, 2012 letter, a "reasonable inference" can be made that American Family conducted an investigation into his conduct in retaliation for the appeal letter. However, it is undisputed that American Family's outside investigator Harold Copus was in charge of the investigation. After interviewing Chad Bowen, Copus determined he needed to interview Farber regarding his knowledge of the embezzlement scheme. (SOF, ¶¶ 59-61) There is no evidence of record that Copus' decision to interview Farber was in any way related to his appeal letter, or that Copus was even aware of the letter. Moreover, Farber admits that every point he raised in his appeal letter was either in direct rebuttal to his supervisor's handwritten list of reasons for demoting him, or referred to something American Family had already implemented prior to his appeal; nowhere in the letter does Farber suggest additional ways in which American Family could prevent future losses or embezzlement schemes. (SOF, ¶¶ 43-49) Neither Copus nor Crandall included Farber's comments, which they found to be "general" and "insignificant," in their notes of the April 20, 2012 meeting, and neither reported Farber's comments to anyone at American Family. (SOF ¶¶ 89-93)

Farber also argues that because he addressed his appeal letter to Jon Guldan, and Guldan was present at his termination meeting five months later, "it can be reasonably inferred" that Guldan was either involved in the decision to terminate him or that Guldan made Lisa Moran aware that Farber had complained or reported that proper systems were not in place to uncover

theft. There are no facts on which to base this inference. It is undisputed that Guldan had no involvement in Farber's appeal; he merely forwarded Farber's appeal letter to his supervisor for assignment of the appeal review. (SOF, ¶ 42) Guldan was present only because American Family usually includes a human resources representative in a termination meeting, and Guldan had been involved in providing background information to Lisa Moran. (SOF ¶¶ 133-134) Moran testified she did not consider the comments and suggestions Farber made at the April 2012 interview on how to prevent future losses significant. (SOF, ¶¶ 139-140.)

Finally, Farber asserts that given Ken Licht and Dwight Gribble's nervousness over the situation involving Smith and Protech, a reasonable inference can be made that American Family was embarrassed that the embezzlement scheme had not been discovered internally and "made up lies about his purported aloofness and evasiveness and not being cooperative and forthright" to justify his wrongful termination. Again, Farber provides no evidence in support of this theory. (See Defendant's Response to PSOF, ¶ 83) To survive a motion for summary judgment, "the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." Fruits v. LS Const. Services of Kansas, Inc., 2013 WL 3664629, at *4 (W.D.Mo. July 12, 2013) (quoting Bazzi v. Tyco Healthcare Group, L.P., 652 F.3d 943, 948 (8th Cir. 2011)). These unsupported "reasonable inferences" are not sufficient to create a genuine dispute of fact precluding summary judgment.

Because there is no evidence that Farber's complaints or suggestions regarding potential changes to company policies or procedures in order to detect or prevent future losses played any role, much less contributed to, American Family's decision to terminate him, the Court will grant summary judgment in favor of American Family on this basis.

Finally, with regard to his cat's paw argument,[9] Farber provides no evidence that Guldan, or any other unnamed representative of American Family, had any bias towards him or motive to influence Lisa Moran to terminate his employment. As discussed above, the record demonstrates that Guldan received Farber's appeal letter, but had no involvement in investigating the appeal except forwarding the letter to his supervisor for assignment. (SOF, ¶¶ 40-42) Following interviews conducted on April 20 and May 9, 2012, which Guldan did not attend, Guldan drafted a document entitled "Ron Farber Situation." (SOF ¶ 106) To prepare this document, he reviewed Licht's notes of the April 20 interview, Copus and Crandall's summaries of the two interviews, and the information contained in Smith's performance notebook, and followed up on certain issues for clarification and confirmation. (SOF, ¶¶ 107-114) Farber disputes these statements, claiming that Guldan did not include Licht's observations of what Farber said in the April meeting in his summary. (Doc. No. 27 at 17) Farber points to Guldan's handwritten note following the meeting:

> "[Licht] saw [Farber] as not aloof; was cooperative. Don't recall them specifically asking if [Farber] knew of Protech b4 anonymous call. Don't recall him denying it. Was it in reference to knowledge/hearing of issues w/P-T or just knowing that P-T existed and was a vendor."

(Doc. No. 26-1 at 24) However, Farber fails to explain how this note creates a genuine issue of material fact.

In June 2012, Guldan provided Moran with his written summary of the investigation and a copy of the key performance notebook entries. (SOF ¶ 115) On August 15, 2012, Moran met with Farber and notified him of his termination. Guldan was present at this meeting only because American Family usually includes a human resources representative in a termination meeting,

---

[9] American Family asserts this argument is beyond the scope of the pleadings. Plaintiff did not raise a cat's paw claim in his Petition, nor does he allege that American Family is liable for his discharge due to the discriminatory animus of a non-decisionmaker. (Doc. No. 30 at 12 n.2) This argument is not without merit; however, because American Family's motion will be granted, the Court need not address it further.

and Guldan had been involved in providing background information to Moran. (SOF, ¶¶ 133-134) Lisa Moran testified she made the decision to terminate Farber's employment because she felt, based on his answers to Copus during the investigation, that Farber had violated American Family's Code of Conduct by misrepresenting his knowledge of Protech during the investigation, had failed to cooperate with the investigation, and was not forthright about his knowledge of Protech and what had taken place. (Deposition of Lisa Moran (Moran Depo.), Doc. No. 23-4, 110:14-111:14; 115:24-116:23; 120:15-21) Moran also testified on deposition that she felt her decision to terminate Farber's employment was the right decision for American Family, and that her position requires her to address issues when employees violate the Code of Conduct and do not adhere to American Family's ethics standards. (Moran Depo., 145:21-146:4) Farber complains that American Family failed to consider his history with the company, his reputation or his veracity. (Doc. No. 27 at 18) However, Moran testified that she took Farber's tenure and past performance into account, which caused her to take longer than usual in coming to the decision to terminate him. (Deposition of Lisa Moran, Doc. No. 23-4, 118:7-16; 143:9-16; 146:8-12) Farber presented no evidence contrary to Moran's testimony about the basis for her decision to terminate his employment.

Farber also disputes that the decision to terminate him was made by Moran alone and states that others may have been involved; however, he provides no factual support for this assertion. Where, as here, a decisionmaker makes an independent determination as to whether an employee should be terminated, and does not serve as a "mere conduit" for another's discriminatory motives, the "cat's-paw" theory fails. See Lacks v. Ferguson Reorganized School District R-2, 147 F.3d 718 (8th Cir. 1998) (finding no cat's paw liability where teacher asserted that principal and superintendent influenced the school board's termination decision where the

evidence supported a conclusion that "the board made an independent determination as to whether [the teacher] should [have been] terminated and did not serve merely as a conduit for the desires of school administrators."). See also, Dedmon v. Staley, 315 F.3d 948, 951 (8th Cir. 2003) (rejecting cat's paw liability in case where county employee sought to hold county clerk liable for retaliation on the basis that employee's immediate supervisor had discriminated against her, noting that here was no evidence the supervisor "possessed any influence or leverage over [the county clerk's] decision to terminate). Because there is no evidence of record that others at American Family influenced Moran's decision to terminate Farber, or that someone "harbored any unlawful animus toward [Farber] and sought to get [him] fired," see, Dedmon, 315 F.3d at 950, the Court rejects Farber's cat's paw theory of liability.

For the foregoing reasons, the Court will grant American Family's motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant American Family Mutual Insurance Company's Motion for Summary Judgment [21] is **GRANTED**.

A separate Judgment will accompany this Memorandum and Order.

_____
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**

Dated this 28th day of August, 2014.